IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ALISA DAWN WHEELER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:19-CV-1012-BH** |
| | § | |
| **ANDREW M. SAUL,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **REVERSED and REMANDED.**

## I.  BACKGROUND

Alisa Dawn Wheeler (Plaintiff) seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner)[2] denying her claim for a period of disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (doc. 1.)

### A.    Procedural History

On November 24, 2015, Plaintiff filed her application for SSI and DIB, alleging disability

---

[1] By consent of the parties and the order of transfer dated July 9, 2019 (doc. 17), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

beginning on October 1, 2015.  (doc. 13-1 at 328-29.)[3]  Her claim was denied initially on June 22, 2016, and upon reconsideration on February 2, 2017. (*Id.* at 237, 244.) On February 21, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 269-70.) She and a vocational expert (VE) appeared and testified at a hearing before the ALJ on February 13, 2018.  (*Id.* at 205-36.) On May 7, 2018, the ALJ issued a decision finding her not disabled and denying her claims for benefits.  (*Id.* at 15-25.)

Plaintiff appealed the ALJ's decision to the Appeals Council on June 22, 2018. (*Id.* at 324-26.)  It denied her request for review on March 26, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-8.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on December 11, 1976, and was 41 years old at the time of the initial hearing.  (*See* doc. 13-1 at 213.)  She had a high school education and a trade school certificate in medical coding. (*Id.* at 211.)

### 2.    Medical Evidence

On July 7, 2015, Plaintiff saw Iftikhar A. Chowdhry, M.D., for her rheumatoid arthritis and fibromyalgia. (*Id.* at 485.) She reported ankle stiffness that lasted approximately 30 minutes in the morning, pain, and swelling in her ankles and hands. (*Id.*) Examination revealed normal range of motion in all joints, no definite synovitis, and tenderness in PIPs and MCPs of her hands and ankles. (*Id.*) She had multiple fibromyalgia tender points, tenderness in the MTPs of her feet, and tenderness

---

[3]  Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

to her left rib cage on palpation. (*Id.*) She was assessed with rheumatoid arthritis, fibromyalgia, periodic limb movement disorder, celiac disease, and fatigue. (*Id.* at 486.) Plaintiff was directed to continue taking her medications and follow up in two months. (*Id.*)

From September 2015 through October 2015, Plaintiff followed up with Dr. Chowdhry for rheumatoid arthritis and fibromyalgia. (*Id.* at 479-83.) She reported stiffness in her joints that lasted all day, and increased joint pain in her elbows, hands, wrists, and knees. (*Id.*) She also reported that she was taking Wellbutrin because she had become suicidal and manic, as well as Cymbalta and Abilify. (*Id.*)  Examination revealed normal range of motion in all joints, no definite synovitis, and tenderness in PIPs and MCPs of her hands, wrists, knees, and elbows. (*Id.*) She also had multiple fibromyalgia tender points. (*Id.*) She was prescribed an Actemra Solution pre-filled syringe, to be taken once a week subcutanously. (*Id.* at 480.)

From November 2015 through April 2016, Plaintiff saw Dr. Chowdhry for rheumatoid arthritis and fibromyalgia. (*Id.* at 468-478.) She reported tolerating Actemra well. (*Id.* at 468, 473, 476.)  She had morning stiffness that lasted approximately 45 minutes to 1 hour, as well as pain in her ankles, knees, hands, and wrists, but she denied joint swelling. (*Id.*) General examination revealed normal range of motion in all joints, no synovitis, and no clubbing or edema in her extremities. (*Id.* at 468, 470, 473, 476.) She was prescribed Vimovo tablets, Zonisamide, and Norco. (*Id.* at 471,474.)

From May 2016 through June 2016, Plaintiff continued to see Dr. Chowdhry. (*Id.* at 462-67.) She reported that Zonegran improved her fibromyalgia pain, but she still hurt all over. (*Id.* at 462,465.)  She denied joint swelling, but had morning stiffness that lasted several hours. (*Id.*) She had trouble falling asleep and sometimes woke up every two hours. (*Id.*) She had pain in her knees,

3

ankles, feet, hands, and wrists. (*Id.*) Examination revealed normal range of motion in all joints, no synovitits, and tenderness in PIPs and MCPs of hands, wrists, knees, and elbows. (*Id.*) She had multiple fibromyalgia tender points. (*Id.*) She was assessed with rheumatoid arthritis, fibromyalgia, and fatigue, and her prognosis was fair.  (*Id.* at 463,466.)

From May 2016 through September, 2016, Plaintiff had monthly follow-up visits at Sunnyvale Medical Group for anxiety, depression, and insomnia. (*Id.* at 558,563, 566, 569,574,576.) She reported moderate to severe loss of interest and depressed mood. (*Id.*) Mental status examination found no evidence of hallucinations, delusions, or obsessions. (*Id.* at 564) Suicidal ideation was present on at least one occasion. (*Id.* at 577.) Plaintiff displayed appropriate judgment and insight, and her mood was noted as depressed. (*Id.* at 564, 568. ) She was prescribed Belsomra and Lunetsa for sleep and given a referral for treatment for her depression. (*Id.* at 564, 570. )

On June 22, 2016, Tina Ward, M.D., a state agency medical consultant (SAMC), completed a physical RFC assessment based upon medical evidence in the record. (*Id.* at  241-42.) Her primary diagnoses were osteoarthrosis and allied disorders, and fibromyalgia. (*Id.* st 240.) She found that Plaintiff had the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk with normal breaks for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday, with an unlimited ability to push/pull. (*Id.* at 242-43.) Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 243.) She concluded that Plaintiff's alleged limitations were "partially supported" by the medical evidence. (*Id.*)

After being referred due to "a lot of depression and insomnia," Plaintiff saw Ana Frederick, Psychiatric Mental Health NP, and Rodolfo Molina, MD, at The Holiner Psychiatric Group (Holiner

Psychiatric), for an initial psychiatric evaluation on July 19, 2016. (*Id.*) She reported several depressive episodes lasting over two weeks over the course of her lifetime, poor energy and motivation, anhedonia, poor concentration, higher anxiety and irritability, excessive daytime sleeping, and a history of suicidal ideation but no intent or attempts. (*Id.*) Her depressive episodes usually lasted three to four days at a time with some manic symptoms, and she also reported not sleeping for days at a time, and feeling physically exhausted, irritable and angry. (*Id.*) She had a history of sexual trauma, dissociated when emotions were heightened, startled easily and was hyper vigilant, and had distress with reminders, impacted interpersonal relationships, and frequent nightmares. (*Id.*) Examination revealed agitated motor activity and good eye contact, and her mood was dysphoric and anxious. (*Id.* at 530.) Her cognitive function, fund of knowledge, and memory function were grossly intact. (*Id.*) Her form of thought was circumstantial, and her judgement/insight was fair. (*Id.*) Plaintiff was diagnosed with moderate bipolar disorder with mixed features, chronic post-traumatic stress disorder, and eating disorders. (*Id.*) She was prescribed Saphris, and it was recommended that she begin psychotherapy. (*Id.* at 531.)

At a follow up visit with Dr. Chowdhry on July 26, 2016, Plaintiff reported fatigue and pain in her right wrist, knees, and ankles. (*Id.* at 517.) Extension of her right wrist and pulling up caused pain. (*Id.*) She reported that Zonegran improved her fibromyalgia pain, but she still felt pain all over. (*Id.*) She denied joint swelling, but felt morning stiffness that lasted several hours. (*Id.*) She had trouble falling asleep and would wake up every two hours. (*Id.*) Examination revealed normal range of motion of C spines, no tenderness in her neck, and no clubbing or edema in her extremities. (*Id.* at 517-18.). She had no tenderness in her back and normal range of motion. (*Id.* at 518.) She had normal range of motion in all joints, and tenderness in PIPs and MCPs of her hands, wrists, knees,

and elbows. (*Id.*) She also had multiple fibromyalgia tender points. (*Id.*) She was assessed with rheumatoid arthritis, fibromyalgia, fatigue, right wrist pain, and rheumatoid arthritis of multiple sites without rheumatoid factor, and directed to continue her treatment plan. (*Id.*)

On July 28, 2016, Plaintiff followed up at Holiner Psychiatric for mood disturbance, anxiety, and disordered eating. (*Id.* at 532.) She reported that her mood had been more stable and her anxiety had improved with Saphris, but her symptoms were still interfering with daily function. (*Id.*) She complained of insomnia, appetite changes, concentration problems, lack of interest, irritability, isolating behavior, and anxiety. (*Id.*) Her mood was dysphoric and anxious; her cognitive function, fund of knowledge, and memory were grossly intact; and her judgment and insight were fair. (*Id.* at 533.) She denied depression but was having trouble sleeping, and she reported purging less frequently. (*Id.* at 532.) Plaintiff was diagnosed with bipolar disorder in partial remission with most recent episode depressed with mixed features, chronic post-traumatic stress disorder, and eating disorders. (*Id.* at 533.) She was continued on her treatment plan and follow up in two weeks. (*Id.*)

From August 2016 through November 2016, Plaintiff had follow up visits at Holiner Psychiatric for mood disturbance, anxiety, and disordered eating. (*Id.* at 535, 538, 541, 545, 574, 549.) She reported "almost sleeping though the night now." (*Id.*) Her mood and anxiety continued to improve with medication, and her symptoms were not interfering as much with her daily function. (*Id.*) She complained of very slight depressed mood, and her concentration problems, lack of interest, motivation, and anxiety had improved. (*Id.*) She was fidgety, and her mood was dysphoric and anxious. (*Id.* at 536, 542, 550.) Her cognitive function, fund of knowledge, and memory function were grossly intact. (*Id.*) Plaintiff was to continue her treatment plan and return for follow up visits. (*Id.* at 537.)

6

On January 28, 2017, Plaintiff saw Lawrence Sloan, Ph.D., for a psychological consultative examination. (*Id*. at 600-604.) Her mother drove her to the appointment. (*Id*.) Plaintiff reported disability due to arthritis, fibromyalgia, migraine headaches, recurrent infections, and depressed mood. (*Id*.) Her daily activities included attending to her two dogs and performing chores around the home on her good days, but she was sedentary when she experienced greater joint pain. (*Id*. at 601.) She could bathe, groom, dress, and feed herself, and she could shop for and prepare food on her own, wash clothes and clean her home. (*Id*.)  Mental status examination revealed Plaintiff was logical and goal directed. (*Id*. at 602.) She had appropriate mood and circumstances and was calm, cooperative, and generally euthymic, but was briefly tearful. (*Id*.) Her working memory was intact, and she was able to do simple math problems. (*Id*.) Her concentration was within normal limits, she presented with intact judgment, and she had general awareness of her symptoms and their impact on her daily living. (*Id*. at 603.)

Dr. Sloan diagnosed Plaintiff with bipolar disorder and anxiety disorder with features of social phobia, and specific phobia. (*Id*. at 603.) Her prognosis was guarded. (*Id*.) Dr. Sloan opined that she had the functional capacity to understand, carry out, and remember instructions involving one and two steps, and she could carry out and remember complex instructions. (*Id*.) Plaintiff could sustain concentration and persist in work-related activity and maintain a reasonable pace. (*Id*.) She could maintain effective social interaction with supervisors, co-workers and the public on a consistent and independent basis. (*Id*.) Dr. Sloan opined that Plaintiff was unable to deal with normal pressures in a competitive work setting, and could understand the meaning of filing for benefits and manage her own funds. (*Id*.)

On February 8, 2017, Joel Forgus, Ph.D., a state agency psychologist consultant (SAPC)

7

completed a psychiatric review technique and a mental RFC assessment based upon the medical evidence. (*Id*. at 252-257.)  He opined that Plaintiff's severe medically determinable impairments were osteoarthrosis and allied disorder, and depressive, bipolar and related disorders. (*Id*. st 251-52.) He found she had mild limitations in ability to understand, remember, or apply information, and moderate limitations in ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. (*Id*. at 252.) She could understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings. (*Id*. at 257.)

Dr. Forgus opined that Plaintiff had the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk with normal breaks for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday, with an unlimited ability to push/pull. (*Id*. at 254.) She had no postural, manipulative, visual, communicative, or environmental limitations. (*Id*.) He concluded that Plaintiff's alleged limitations were "partially supported" by the medical evidence. (*Id*. at 255.)

On May 16, 2017, Dr. Chowdhry completed an arthritis RFC questionnaire. (*Id*. at 670-73.) He diagnosed Plaintiff with rheumatoid arthritis, fibromyalgia, and back pain, and guarded prognosis. (*Id*. at 670.) He noted a reduced range of motion in Plaintiff's spine, knees, hands, and feet, reduced grip strength, sensory changes, impaired sleep, tenderness, crepitus, and positive trigger points. (*Id*.) She could sit for one hour before needing to stand up, stand for 30 minutes, stand/walk less than two hours, sit for about four hours, and needed unscheduled breaks every one to two hours. (*Id*. at 671-72.) Every 30 minutes, she needed breaks of at least five minutes to walk, for which she would require a cane or other assistive device. (*Id*. at 672.) With a sedentary job, she

needed to elevate her legs two to three feet from the ground for 10 to 20 percent of the time in an eight-hour workday. (*Id*.)  She could never twist, stoop, crouch/squat, or climb ladders. (*Id*. at 673.) She would miss more than four days of work per month because of her impairments. (*Id*.)

From May 25, 2017 through December 5, 2017, Plaintiff saw Dr. Chowdhry for her rheumatoid arthritis and fibromyalgia. (*Id*. at 705-30.) She reported hurting all over, bilateral ankle pain, knee pain, morning stiffness, and Achilles's pain that radiated up to her calves. (*Id*. at 703, 707, 712, 718, 723.) Physical examination revealed tenderness to all joints, multiple tender points, and sensitivity to touch. (*Id*. at 704, 707-08, 712, 716, 719,724.) She was assessed with rheumatoid arthritis, fibromayalgia, bilateral primary osteoarthritis of knee, osteopenia, right knee effusion, and pain. (*Id*. at 704, 708, 712, 716, 719, 724.)  She was given a Synvisc injection in both knees and told to continue her current treatment plan. (*Id*. at 704-05, 708, 713, 716, 719-20, 724-25.)

3.    **Hearing**

On February 13, 2018, Plaintiff and a VE testified at a hearing before the ALJ. (*Id.* at 205-36.) Plaintiff was represented by an attorney. (*Id.* at 207.)

a.    **Plaintiff's Testimony**

Plaintiff testified that she was 5'7" tall, weighted 205 pounds, was divorced, had no children under 18, and was right-handed. (*Id*. at 213-14.) She could read and do basic math. (*Id*.) She did not drive very often because issues with her ankles and wrist. (*See id*. at 214.)

She had past work experience at Hospital Receivable Service doing medical coding and physician billing but was let go because of her absences. (*Id*. at 215.) She also had past work experience for Health Texas Provider Network doing physician billing. (*Id*.) She had worked as a volunteer manager for Sharing Wide Community Outlook organizing outreach programs . (*Id*.) She

testified that she could no longer perform those jobs on a regular and continuing basis because of her hands, arms, issues with sitting, and her mental state. (*Id*. at 217.)

Plaintiff was diagnosed with rheumatoid arthritis in 2011 by Dr. Chowdhry. (*See id*. at 218.) She was prescribed several DMARDs and given three different biologics that didn't improve her symptoms, and she was taking Prednisone and Plaquenil. (*Id*.) Her knuckles, fingers, hands, wrists, ankles, and toes were affected the most by her arthritis. (*Id.*) When her feet or ankles swelled, her toes went numb, and she also experienced numbness in her hands. (*Id*. at 219.) She had neck pain and numbness that radiated down her arm, and she sometimes lost feeling in her fingers. (*Id*.) She had a bulging disc at C5 and C6, and her treatment included injections and "nerve burnings." (*Id*. at 219, 228.) She couldn't open a can with a hand crank can opener because the motion hurt her wrist. (*Id*. at 220.) She could only type on a keyboard for approximately one hour but made lots of errors. (*Id*.) She could fasten buttons but had issues with her undergarments and reaching back. (*Id*.)

Plaintiff had issues driving because she was unable to control the steering wheel properly. (*Id*. at 221.) She hit the curb several times and had gone into other lanes because she was not able to turn the steering wheel properly when her wrists were acting up. (*Id*. at 221-22.) She didn't sleep well at night but could sleep for a few hours if she took medication. (*Id*. at 221.) Although she experienced a lot of fatigue, she didin't sleep much during the day. (*Id*.) She found it difficult to sleep when she was in pain and just laid on her back or side. (*Id*.) She was most comfortable when reclined in a seated position, and she could not sit straight up or on a particular side because of hip and back issues. (*Id*. at 222.) She had received gel injections for knee pain, had difficulty walking long distances, and couldn't go up stairs without feeling stabbing pains that usually made her leg give out. (*Id*. at 223.) She did not grocery shop anymore because it was difficult to walk; she had

not gone shopping in a "few years." (*Id*. at 223, 231.) She also had difficulty standing; she could stand for approximately 30 minutes before it became difficult, and she would need to move around. (*Id*. at 223-24.) She had difficulty sitting for long periods and needed to "get up quite a bit." (*Id*. at 224.) On a good day she could sit for an hour or two before needing to get up. (*Id*.) She could not bend at the waist and pick things up off the floor without pain. (*Id*.) She had problems pushing and pulling and difficulty lifting a five-pound bag. (*Id*.) She could lift a gallon of milk with both hands, but could not lift a gallon of milk four times in an hour all day long. (*Id*. at 225)

Plaintiff had migraines that occured three to four times a month, and "then [she was] down for maybe two to three days." (*Id*. at 225.) She lost sight in her left eye when she had "visual migraines"; she became "violently ill with them" and vomited. (*Id*.) She had been diagnosed with major depressive disorder, bipolar disorder, and post traumatic stress disorder. (*Id*. at 225, 227.) She had anger problems and manic episodes. (*Id*. at 226.) She had tried numerous medications and experienced suicidal ideation with some of them. (*See id*.) She didn't cook often and used the oven or microwave. (*Id*. at 230.) She washed the dishes but did not do yard work, vacuum, sweep, or mop. (*Id*.) She took the trash out to the bin, but could not get it into the bin. (*Id*. at 230.) She did small loads of laundry and went to church, but did not go to meetings or see friends. (*Id*. at 231.)

### b.    VE's Testimony

The VE testified that Plaintiff had past relevant work experience as a billing clerk, dictionary of occupational titles (DOT) 214.362-042 (sedentary, SVP 4); medical record coder, DOT 079.662-014 (sedentary, SVP 7); and volunteer coordinator, DOT 187.167-022 (sedentary, SVP 7). (*Id*. at 233.) The VE considered a hypothetical individual with the same age, education, and experience as Plaintiff, but this individual could lift only 10 pounds occasionally or less than 10 pounds frequently;

stand or walk for a total of two hours in an eight-hour day or sit for six hours in an eight-hour day with normal breaks; push and pull the same as lift and carry; understand, remember and carry out simple, routine and repetitive tasks; make simple work decisions; and concentrate on simple tasks for extended periods with normal breaks. (*Id*. at 234.) She could tolerate occasional superficial interaction with supervisors, coworkers, and the public, and adapt to few changes in a routine work setting. (*Id*.)  The VE testified that the hypothetical individual could not perform any of Plaintiff's past work. (*Id*.) The hypothetical individual could perform work as an addresser, DOT 209.587-010 (sedentary, SVP 2), with 7,790 jobs nationally; document preparer, DOT 249.587-018 (sedentary, SVP 2), with 44,595 jobs nationally; and surveillance system monitor, DOT 379.367-010 (sedentary SVP 2), with 4,541 jobs nationally. (*Id*.)

The VE considered a second hypothetical individual with the same limitations but who needed to elevate her legs two to three feet from the floor for 10 to 20 percent of the day. (*Id*. at 234-45.) This limitation would preclude employment. (*Id*. at 235.)  The VE next considered a third hypothetical individual who could not do any handling, fingering or reaching. (*Id*.) This limitation would also preclude employment. (*Id*.) The VE also testified that if a hypothetical individual missed four or more days per month, that would preclude employment. (*Id*.)

**C.    ALJ's Findings**

The ALJ issued his decision denying benefits on May 7, 2018. (*Id*. at 15-25.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since October 1, 2015, the alleged onset date.  (*Id.* at 17.)  At step two, the ALJ found that Plaintiff had the following severe impairments: rheumatoid arthritis, osteoarthritis, osteopenia, fibromyalgia, affective disorder, anxiety disorder, and trauma related disorder. (*Id*.)  Despite these impairments, at step three, he

found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 20.)

Next, the ALJ determined that Plaintiff retained the RFC to lift and/or carry 10 pounds occasionally, lift and/or carry less than 10 pounds frequently, stand/walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (*Id.* at 21.) She could understand, remember, and carry out simple, routine and repetitive tasks and instructions, make simple decisions, attend and concentrate on simple tasks for extended periods with normal breaks, and adapt to few changes in a routine work setting. (*Id.*) She was limited to occasional superficial interaction with supervisors, coworkers, and the public. (*Id.*) At step four, the ALJ found she was unable to perform any past relevant work. (*Id.* at 23.)  At step five, the ALJ found that considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 24.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 1, 2015, through the date of his decision. (*Id.*)

**D.**   **New Evidence Submitted to the Appeals Council**

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence consisting of medical records from Dr. Molina, dated January 31 through April 16, 2018. (*Id.* at 41-87.) She saw Dr. Molina for mood disturbance, anxiety, eating disorder, insomnia, and auditory hallucinations. (*Id.* at 43, 51, 59, 69, 77.) She appeared fidgety, agitated, depressed, and anxious. (*Id.* at 47, 55, 63, 73, 81.) He diagnosed her with bipolar disorder, severe depression with psychotic features, post-traumatic stress disorder, and an eating disorder, and prescribed Seroquel and continuation of her medications. (*Id.* at 49, 57, 63, 65, 75, 83.)

At a follow up with Dr. Molina for mood disturbance and anxiety, Plaintiff reported that she was admitted to Green Oaks overnight for severe depression with suicidal ideation, but she had seen improvement in her mood and anxiety with her current medication. (*Id*. at 77.) She was fidgety, agitated, depressed, anxious, and distracted. (*Id*. at 81.)  She was diagnosed with bipolar disorder, severe depression without psychotic features, post-traumatic stress disorder, and eating disorder. (*Id*.)  Dr. Molina increased Plaintiff's prescription for Seroquel, continued her medications, and directed her to follow up in four weeks. (*Id*. at 83.)

The Appeals Council denied the request for review on Mach 26, 2019, finding that the new evidence did not relate to the period at issue and therefore did not affect whether Plaintiff was disabled beginning on or before May 7, 2018. (*Id.* at 6.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).[4]  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding

---

[4]The scope of judicial review of a decision under either the supplemental security income program or the social security disability program is the same.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of claims under either program are also identical, so courts may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*.

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.   [Whether there was] "good cause" to reject the physician's opinion when [Plaintiff's] disability was based in part on fibromyalgia, an impairment that cannot be objectively verified?

2.   [Whether the] new evidence dilute[s] the record and require[s] remand when the ALJ previously considered [Plaintiff] stable on medications?

(doc. 20 at 6.)

### A.   <u>Treating Physician's Opinion</u>

Plaintiff argues that the ALJ rejected a treating specialist's opinion without good cause and without conducting the detailed analysis required by regulation. (*Id*. at 16.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a

16

treating source. *Id*. §§ 404.1527(c)(2), 416.927(c)(2).[5] A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. §§ 404.1527(c)(2), 416.927(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques,

---

[5]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

or is otherwise unsupported by the evidence." *Id*. at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, the examination notes of Plaintiff's treating doctor from July 2015 through June 2016, reflected his findings that Plaintiff had multiple fibromyalgia tender points and "tenderness in PIPs and MCPs of hands, wrists, knees, and elbows." (*Id*. at 462, 470, 473, 479, 482, 485.)  He noted tenderness of the MTPs of her feet and that her fibromyalgia was "still active." (*Id*. at 463, 485.) A bone density test showed osteopenia of Plaintiff's spine and left hip. (*Id*. at 653.)  Bilateral ankle x-rays revealed left fibulotalar joint erosions and joint damage, bilateral os trigonum, some joint space narrowing in the subtaler joints, and bilateral calcaneal spurs. (*Id*. at 651.)

After treating her for two years, Dr. Chowdhry completed an arthritis RFC questionnaire, noting a reduced range of motion in her spine, knees, hands, and feet. (doc. 13-1  at 670.) He found she could sit for one hour before needing to stand up, stand/walk for less than two hours, and sit for about four hours. (*Id*.) Every 30 minutes, she needed breaks of at least five minutes to walk, for which she would require a cane or other assistive device. (*Id*.) With a sedentary job, she needed to elevate her legs two to three feet from the ground for 10 to 20 percent of the time in an eight-hour

workday. (*Id*.) She would miss more than four days of work per month because of her impairments. (*Id*. at 673.)

The ALJ considered Dr. Chowdhry's opinion and found that there was little support for his assessment that Plaintiff was "functionally limited by her impairments to no more than a 6-hour time frame working, with no lifting/carrying, and requiring the use of an assistive walking device." (*Id*. at 23.)  He concluded that Dr. Chowdhry's reports primarily summarized Plaintiff's "subjective complaints, diagnoses, and treatment, but [did] not present objective clinical or laboratory diagnostic findings that support this functional assessment." (*Id*.) Instead, the ALJ found that Plaintiff's testimony "indicates that she is capable of a greater range of physical activity on a daily basis." (*Id*.) He noted she could maintain her own personal hygiene, prepare meals, perform household chores, drive a vehicle, go shopping, attend church, read, manage money, care for pets, watch movies and get her nails done. (*Id*.)  The ALJ failed to assign any weight to Dr. Chowdhry's opinions.

Although the ALJ focused on the absence of objective clinical or laboratory diagnostic findings to support Dr. Chowdhry's opinion, "[a] diagnosis of fibromyalgia often lacks objective clinical findings." *Bragg v. Comm'r of Soc. Sec. Admin*., 567 F. Supp. 2d 893, 912 (N.D. Tex. 2008) (collecting cases).

> When a claimant has an accepted diagnosis, such as fibromyalgia, that often lacks objective clinical findings, an allegation of an absence of objective clinical findings does not alone constitute good cause to reject opinions of treating physicians. To show good cause under such circumstances, the ALJ's decision must do more than merely state that the opinions "are not supported by any objective clinical findings."

*Id*. The ALJ was therefore required to do more in order to show good cause to reject Dr. Chowdhry's opinions without performing the six-factor analysis.

The ALJ did not identify any competing first-hand medical evidence obtained by examining

physicians that contradicted Dr. Chowdhry's opinions, however.  He also did not identify evidence that supported a contrary conclusion.  He considered but gave little weight to the other opinions in the record, i.e., those of the SAMCs, because "evidence received at the hearing level shows that [Plaintiff] is more limited than determined by the [SAMCs]."  (*Id*. at 23.)  The SAMCs determined that Plaintiff had the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk with normal breaks for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday, with an unlimited ability to push/pull. (*Id*. at 242-43.) They also opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (*Id*. at 243.)

As for his reliance on Plaintiff's testimony to support his findings, she testified that she hardly drove because of the pain in her ankles and wrists, and that she had "hit the curb several times or gone into other lanes because [she] was not able to get the steering wheel to turn properly when her wrists [were] acting up." (*Id*. at 214, 221.) She also testified that she did not go grocery shopping and had not gone for a few years because of her illnesses, injuries, or conditions. (*Id*. at 230-31, 361.) Her function report and testimony do not show that she was able to get her nails done, contrary to the ALJ's findings. (*See id*. at 207-232, 360-367.)

Since the ALJ did not give controlling weight to Dr. Chowdhry's medical opinions, and he did not rely on or identify any competing first hand medical evidence from a treating or examining physician controverting those opinions, he was required to perform the six-factor analysis outlined in 20 C.F.R. § 404.1527(c)(1)–(6). He did not specifically perform that analysis, but only noted some inconsistencies between his observations, the medical records, and Plaintiff's own testimony. (doc. 13-1 at 23.)  The ALJ's failure to consider all of the evidence from Plaintiff's treating source

20

and failure to present good cause for rejecting his opinions was error. *See Newton*, 209 F.3d at 455–58; *see also Loza*, 219 F.3d at 393 (holding that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position").

**B.    Harmless Error**

Plaintiff argues that the ALJ's error was not harmless because she would have been found disabled had the ALJ adopted Dr. Chowdhry's opinion. (doc. 20 at 22.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, had the ALJ given weight to Dr. Chowdhry's opinions regarding Plaintiff's limitations, he could have found additional limitations that would have affected his RFC determination, and/or that Plaintiff was precluded from her past relevant work and the jobs identified by the VE. Accordingly, the ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he given great weight to Dr. Chowdhry's opinions. *See McAnear v. Colvin*, No. 3:13–cv–4985-BF, 2015 WL 1378728, at *5 (N.D.Tex. Mar. 26, 2015)(finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether

such a review would have changed the outcome of his decision); *Paul v. Colvin*, No. 3:12–cv–00130, 2013 WL 1294666-G (BH), at (N.D.Tex. Mar. 14, 2013)(finding the ALJ's error in failing to present good cause for rejecting a treating source's opinion was not harmless where it was not inconceivable that the ALJ would have reached a different conclusion had he considered the opinion); *Singleton v. Astrue*, No. 3:11–cv–2332-BN, 2013 WL 460066, at *6 (N.D.Tex. Feb. 7, 2013)(finding the ALJ's error in not considering the medical source opinion was not harmless and reversal and remand were required because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision). Remand is therefore required on this basis.[6]

## IV.   CONCLUSION

The Commissioner's decision is **REVERSED and REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this **5**th day of November, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Because the ALJ's determination of Plaintiff's RFC on remand will likely affect the remaining issue, it is not addressed.

22